**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL OLEKSIW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV600 ERW** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Michael Oleksiw's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. Plaintiff has filed a Brief in Support of Complaint. (Document Number 19). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income, claiming that he became unable to work due to his disabling condition on November 15, 2002.[2] (Tr. 15). This claim was denied initially, and following an administrative hearing,

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

[2]Plaintiff's application is not included in the transcript.

plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated December 2, 2004. (Tr. 12-21). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on February 3, 2006. (Tr. 7-10). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on June 28, 2004. (Tr. 41). Plaintiff was present and was represented by counsel. (Id.). The ALJ noted that plaintiff's father, Gary Oleksiw, was also present. (Tr. 43). The ALJ admitted the exhibits into the record. (Id.).

Plaintiff's attorney then provided an opening statement. (Tr. 44). Plaintiff's attorney stated that plaintiff experiences medical problems related to phenylketonuria (PKU)[3], which is a metabolic disorder with which plaintiff was born. (Tr. 45). He stated that plaintiff also suffers from attention deficit hyperactivity disorder (ADHD).[4] (Id.). Plaintiff's attorney argued that plaintiff is unable to perform any kind of work activity due to his non-exertional impairments. (Tr. 46).

The ALJ then examined plaintiff, who testified that he has a high school diploma. (Tr.

---

[3]Phenylketonuria (PKU) is a recessively inherited inborn error of metabolism of phenylalanine, which is a nutritionally essential amino acid. PKU can produce brain damage resulting in severe mental retardation, often with seizures, and other neurologic abnormalities. See Stedman's Medical Dictionary, 1367 (27th Ed. 2000).

[4]Attention deficit hyperactivity disorder (ADHD) is a disorder of childhood and adolescence manifested a home, in school, and in social situations by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. Stedman's at 525.

47).  Plaintiff stated that he had worked for a landscaping business, where he performed physical landscaping work.  (Id.).  Plaintiff testified that he stopped working at this position because the company owed him back pay and treated him "like crap."  (Id.).  Plaintiff stated that he has been unable to work since November of 2002 because he discovered that he has a "serious mind problem," which causes an inability to handle co-workers or work stress.  (Id.).  Plaintiff stated that he filed his application for disability benefits because he needs help paying his everyday bills.  (Tr. 48).

Plaintiff testified that he lives with his father.  (Tr. 48).  Plaintiff stated that during a typical day, he watches televisions and performs chores, and occasionally exercises and swims.  (Id.).  Plaintiff testified that he is able to read, watch television, and listen to the radio.  (Id.).

Plaintiff stated that he does not have a driver's license because his license was taken away after he was convicted of Driving While Intoxicated (DWI).  (Id.).  Plaintiff testified that he has more than one DWI conviction.  (Tr. 49).  Plaintiff stated that he occasionally drinks.  (Id.).  Plaintiff testified that he has participated in different substance abuse programs, including Alcoholics Anonymous (AA).  (Id.).  Plaintiff stated that he stopped attending substance abuse program meetings when he lost his driver's license and did not have any other means of transportation.  (Id.).

Plaintiff testified that he experiences problems with his attention and concentration.  (Id.).  Plaintiff stated that these impairments make it difficult for him to follow orders on the job.  (Id.).  Plaintiff testified that he also has difficulty interacting with people on the job, which has led to arguments at work.  (Id.).  Plaintiff stated that he occasionally has problems receiving orders from supervisors.  (Tr. 50).  Plaintiff explained that at his last job, two of his supervisors were high

school friends, and he did not have a problem receiving orders from them. (Id.). Plaintiff stated that he did not cooperate well with the other supervisors. (Id.). Plaintiff testified that he got along well with fellow workers. (Id.).

Plaintiff testified that he does not see things that are not there; he does not ever think of suicide; he likes being around other people; and he does not refrain from engaging in activities that he enjoys. (Id.). Plaintiff testified that he takes Ritalin,[5] which helps his condition. (Id.). Plaintiff stated that he does not experience any side effects from the Ritalin. (Tr. 51).

When asked by the ALJ why he is unable to work, plaintiff responded that he does not have any transportation, he does not have any real references, and he does not know anybody. (Id.).

Plaintiff's attorney then questioned plaintiff, who testified that he has been seeing a psychiatrist, Dr. Ai-Ling Wu, for six months to a year. (Id.). Plaintiff stated that to control his PKU, he has to consume six amino acid bars a day, take a multi-vitamin, and watch his daily protein intake. (Id.).

Plaintiff testified that he lives alone in an apartment that his father provides. (Tr. 52). Plaintiff stated that he has had at least seven different jobs. (Id.). Plaintiff testified that he worked at the landscaping position the longest amount of time, which was four years. (Id.). Plaintiff stated that he got this position because a friend of his from high school worked for the company. (Id.). Plaintiff testified that he quit this position on about four different occasions because he was unable to "think straight." (Tr. 53).

---

[5]Ritalin is a stimulant indicated for the treatment of ADHD. See Physician's Desk Reference (PDR), 2269 (61st Ed. 2007).

Plaintiff stated that he only worked at the other positions for about three months at a time because he could not handle them. (Id.). Plaintiff explained that he had problems completing the jobs as required and getting to work on time. (Id.). Plaintiff stated that he quit some of the jobs and he was fired from some of them. (Id.).

Plaintiff testified that he was hospitalized on one occasion for a hernia and on another occasion he was hospitalized because his doctors wanted to monitor his psychiatric medications. (Id.).

The ALJ next examined the vocational expert, Stephen Dolan, who identified plaintiff's past work as landscape laborer, which he described as unskilled and medium as performed by plaintiff. (Tr. 54). He described plaintiff's work on a golf course as a groundskeeper two, semi-skilled and medium. (Id.).

The ALJ first asked Mr. Dolan to assume a hypothetical individual who is 26 years old, has a high school education, is capable of performing medium work, and has the following limitations: a mild limitation in understanding, memory, and the ability to follow directions; and a moderate limitation in attention, concentration, and pace. (Tr. 55). Mr. Dolan testified that such an individual could perform plaintiff's past work as a landscape laborer at the medium exertional level or as a groundskeeper two. (Id.).

The ALJ next asked Mr. Dolan to assume a moderate limitation on attention, concentration, understanding, memory, pace, ability to follow directions, and association with the public; and a marked limitation on association with supervisors. (Id.). Mr. Dolan testified that an individual with these limitations could not perform plaintiff's past work and could not perform any other work. (Id.).

After plaintiff's attorney indicated that he did not have any questions for Mr. Dolan, the ALJ concluded the hearing. (Tr. 56).

**B.      Relevant Medical Records**

The record reveals that plaintiff was diagnosed with PKU at one month of age and was maintained on a special low phenylalanine diet throughout his life. (Tr. 114). Plaintiff exhibited delayed language development beginning at age three. (Id.). Plaintiff experienced difficulty with attention and concentration and behavior beginning at age four, and was placed on stimulant medications, including Ritalin, during his first grade year. (Id.). Plaintiff was placed in special learning disability/behavioral disability classes in 1990. (Id.). At age eleven, plaintiff was diagnosed with depression. (Tr. 120). At age twelve, plaintiff was assessed as having normal to above normal cognitive abilities, yet severe ADHD and developmental delays, which caused learning disabilities. (Tr. 126-29). Plaintiff received treatment for these impairments through various mental health providers, including Cardinal Glennon (Tr. 161-67, 209-12), Child Neurology Associates (Tr. 195), Children's Hospital (Tr. 191-93), and the Washington University School of Medicine (Tr. 183-89, 207-08).

Plaintiff began seeing Elizabeth Ballard, M.D. in 1998, for treatment of general medical complaints and monitoring of his psychiatric medications. (Tr. 133-51). On August 23,1999, Dr. Ballard diagnosed plaintiff with insomnia[6] and anxiety and prescribed Amantadine,[7] Ritalin and

---

[6]Inability to sleep, in the absence of external impediments, during the period when sleep should normally occur.  See Stedman's at 906.

[7]Amantadine is an antiviral drug indicated for the treatment of infection and for the treatment of Parkinson's Disease.  See PDR at 1135-36.

Paxil.[8]  (Tr. 145).  On September 27, 1999, Dr. Ballard prescribed Zoloft[9] for plaintiff's anxiety.

(Tr. 142).  On April 27, 2000, Dr. Ballard noted that plaintiff's mother had passed away earlier

that month.  (Tr. 140).  On August 17, 2000, plaintiff reported that he planned to move to West

Virginia to help start a restaurant.  (Id.).  On August 16, 2001, Dr. Ballard's assessment was

ADHD and hair loss.  (Tr. 139).

Plaintiff saw Dorothy K. Grange, M.D., on July 15, 2002, for a follow-up regarding his

PKU.  (Tr. 156-57).  Dr. Grange noted that plaintiff's general health was good, although he had

not been drinking his formula for at least six months and had generally not been following his

phenylalanine restriction carefully.  (Tr. 156).  Plaintiff indicated that he is more forgetful and has

difficulty concentrating when his phenylalanine levels are high.  (Id.).  Plaintiff reported that he

took Ritalin "once in a while," but not on a regular basis.  (Id.).  Dr. Grange found that plaintiff's

phenylalanine levels were "markedly elevated above treatment range."  (Id.).  Dr. Grange advised

plaintiff to drink his formula on a regular basis and limit his phenylalanine intake.  (Id.).

Plaintiff saw Dr. Grange on January 2, 2003, for a follow-up.  (Tr. 154-55).  Plaintiff

reported that he still was not following his PKU diet very well.  (Tr. 154).  Plaintiff indicated that

he did not like the flavor of the formula and requested that the brand be changed.  (Id.).  Dr.

Grange found that plaintiff's condition had been stable for the past six months.  (Id.).  Dr. Grange

changed the flavor of plaintiff's formula and advised him to restrict his phenylalanine intake.  (Tr.

155).

---

[8]Paxil is a psychotropic drug indicated for the treatment of depression, obsessive-compulsive disorder, anxiety disorders, and posttraumatic stress disorder.  See PDR at 1530-31.

[9]Zoloft is an antidepressant indicated for the treatment of depression, obsessive-compulsive disorder, anxiety disorders, and posttraumatic stress disorder.  See PDR at 2586-88.

Dr. Grange completed a Physical Medical Source Statement on February 4, 2003, in which she indicated that plaintiff has no physical restrictions due to his PKU. (Tr. 108-09). Dr. Grange expressed the opinion that plaintiff was capable of sustaining a 40-hour workweek on a continual basis. (Tr. 110). Dr. Grange noted that plaintiff suffers attention deficits and a learning disability as a result of the PKU. (Id.).

On March 4, 2003, plaintiff saw Barbara Barnes, Ph.D., for a psychological consultation at the request of plaintiff and his father due to plaintiff's inability to keep jobs, poor organizational skills, problems with attention and concentration, multiple car accidents, financial problems, past alcohol abuse, and difficulty following his PKU diet. (Tr. 240). Dr. Barnes indicated that she had treated plaintiff until age eleven, when his care was transferred to Children's Hospital. (Id.). Dr. Barnes noted that the PKU diet was very difficult to adhere to and that failure to follow the diet often results in increased attention deficit, impulsivity, irritability, and reduced learning ability. (Id.). Plaintiff's medications were listed as Ritalin and Amantadine. (Id.). Plaintiff reported that he was working part-time in a lawn-care position. (Id.). Dr. Barnes administered several psychological tests, after which she diagnosed plaintiff with ADHD, deficit in executive function, rule out learning disability, with a global assessment of functioning (GAF)[10] of 55.[11] (Tr. 241). Dr. Barnes recommended a medication adjustment to control ADHD symptoms and individual

---

[10]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[11]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

psychotherapy. (Id.). She noted that plaintiff's ADHD symptoms and related difficulties with executive function result in "significant disability with regard to employment," and recommended that plaintiff apply for social security benefits while pursuing psychotherapy and vocational counseling. (Tr. 242).

Dr. Barnes completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on June 24, 2003. (Tr. 245). Dr. Barnes expressed the opinion that plaintiff's ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, follow simple job instructions, maintain personal appearance, behave in an emotionally stable manner, and relate in social situations were good; his ability to use judgment, deal with work stresses, function independently, follow detailed but not complex job instructions, and demonstrate reliability were fair; and his ability to be attentive/concentrate, and follow complex job instructions were "poor or none." (Id.).

Plaintiff underwent a psychological evaluation with Tom Davant Johns, Ph.D., at the request of the Commissioner, on March 11, 2003. (Tr. 214-19). Plaintiff complained of not being able to stay on task, headaches, and irritability. (Tr. 214). Dr. Johns noted that plaintiff was cooperative, yet he made some contradictory statements regarding his use of substances. (Id.). Plaintiff reported that the stimulant medications prescribed to him-Ritalin and Amantadine-help to keep him focused, calm him, and help him relate to people. (Tr. 215). Plaintiff indicated that his ADHD impairs his ability to effectively concentrate at work, causing him to be fired from about fifty percent of his jobs. (Id.). Dr. Johns stated that plaintiff's activities of daily living were intact, as plaintiff reported that he is able to cook, clean, shop for groceries, and do laundry. (Tr. 218). Dr. Johns found that plaintiff was mildly to moderately impaired in his ability to complete

tasks in a timely manner over a sustained period of time due to his ADHD. (Id.). Dr. Johns

diagnosed plaintiff with alcohol dependence in early full remission; polysubstance abuse including

cannabis and cocaine; ADHD; and personality disorder[12] not otherwise specified with antisocial

features; and a GAF of 58. (Tr. 218-19).

Aine Kresheck, Ph.D., a non-examining state agency psychologist, completed a Psychiatric

Review Technique on March 25, 2003. (Tr. 220-33). Dr. Kresheck indicated that plaintiff

suffered from ADHD; personality disorder, not otherwise specified, with antisocial features;

alcohol dependence in early remission; and polysubstance abuse. (Tr. 227). Dr. Kresheck found

that plaintiff had mild limitations in his activities of daily living; moderate limitations in his ability

to maintain social function and ability to maintain concentration, persistence or pace; and no

repeated episodes of decompensation. (Tr. 230). Dr. Kresheck also completed a Mental Residual

Functional Capacity Assessment. (Tr. 234-36). Dr. Kresheck expressed the opinion that plaintiff

was not significantly limited in the following areas: ability to remember locations and work-like

procedures, understand and remember very short and simple instructions; carry out very short and

simple instructions; perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; sustain an ordinary routine without special supervision;

make simple work-related decisions; interact appropriately with the general public; ask simple

questions or request assistance; maintain socially appropriate behavior; travel in unfamiliar places

or use public transportation; and set realistic goals or make plans independently of others. (Tr.

---

[12]A general term for a group of behavioral disorders characterized by usually lifelong
ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle,
and social adjustment, which patterns may manifest in impaired judgement, affect, impulse
control, and interpersonal functioning. Stedman's at 527.

234-35). Dr. Krescheck found that plaintiff was moderately limited in the following areas: ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with others without being distracted; complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Id.).

Plaintiff presented to Ai-Ling Wu, M.D. for a psychiatric evaluation on August 18, 2003. (Tr. 250-53). Dr. Wu found plaintiff to be "partially reliable, but a poor historian." (Tr. 250). Plaintiff reported that he had been off Ritalin and Amantadine for the past five years. (Id.). Plaintiff reported increased difficulty with concentration. (Id.). Plaintiff indicated that Ritalin helped him to focus. (Tr. 251). Dr. Wu noted that plaintiff was not compliant with his PKU diet. (Id.). Dr. Wu's diagnosis was ADHD, probably secondary to PKU; history of Post Traumatic Stress Disorder; alcohol dependence, marijuana abuse; and a GAF of 50.[13] (Tr. 252). Dr. Wu recommended that plaintiff try Strattera[14] or Wellbutrin,[15] depending on his insurance coverage. (Tr. 253). Dr. Wu also advised plaintiff to abstain from drug use and comply with his suggested

---

[13]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[14]Strattera is indicated for the treatment of ADHD. See PDR at 1814-15.

[15]Wellbutrin is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1603-04.

diet.  (Id.).

Dr. Wu completed a Medical Assessment of Ability to Do Work-Related Activities
(Mental) on May 27, 2004.  (Tr. 248-49).  Dr. Wu expressed the opinion that plaintiff's ability to
deal with the public, interact with supervisors, behave in an emotionally stable manner, and relate
predictably in social situations were good; plaintiff's ability to relate to co-workers, deal with
work stresses, function independently, follow simple job instructions, and demonstrate reliability
were fair; and plaintiff's ability to follow work rules, use judgment, be attentive/concentrate,
follow complex job instructions, follow detailed but not complex instructions, and follow simple
job instructions were "poor or none."  (Tr. 248).  Dr. Wu stated that as long as plaintiff is unable
to control his PK levels, his attention and memory will be poor and he will have trouble holding
full-time employment.  (Tr. 249).

Plaintiff underwent psychological testing on January 24, 2004, at Washington University.
(Tr. 268-72).  Plaintiff's IQ was found to be in the average range.  (Tr. 272).  One area of
concern was plaintiff's sustained attention abilities.  (Id.).  Desiree A. White, Ph.D., found that
plaintiff's test scores were consistent with a diagnosis of ADHD.   (Id.).  Dr. White stated that it
is likely that plaintiff's ADHD underlies his poor performance on other tests, including tests of
memory and executive ability.  (Id.).  Dr. White recommended medication adjustments to control
plaintiff's ADHD symptoms and therapy.  (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on
      November 15, 2002, the date the claimant stated he became unable to work, and
      continued to meet them through December 31, 2002.

2.      The claimant has not engaged in substantial gainful activity since November 15, 2002.

3.      The medical evidence establishes that the claimant has severe impairments, including ADHD, PKU, polysubstance abuse in claimed remission, and depression, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The allegations of the claimant were generally not credible, as discussed in the body of this decision.

5.      The claimant has the residual functional capacity to perform work-related activities except for greater than medium work, work not tolerating moderate limitation in maintaining attention and concentration, and mild limitation in understanding, memory, maintaining pace, and following directions (20 CFR 404.1545 and 416.945).

6.      The claimant's past relevant work as landscape laborer did not require the performance of work-related activities precluded by the above limitations (20 CFR 404.1565 and 416.965).

7.      The claimant's impairments do not prevent him from performing his past relevant work.

8.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(c) and 416.920(c)).

(Tr. 21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on January 28, 2003, the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act, and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Id.).


## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.

<u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

 <u>See</u> 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  <u>Id.</u>  Age, education and work experience of a claimant are not considered in making the "severity" determination.  <u>See</u> <u>id.</u>

        If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**    **Plaintiff's Claims**

Plaintiff raises two claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in formulating plaintiff's residual functional capacity by disregarding treating source opinions. Plaintiff also argues that the ALJ erred in determining that plaintiff was able to perform his past work as a landscaper.

**1.**    **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity by disregarding treating source opinions. Specifically, plaintiff claims that the ALJ erred in disregarding the opinions of Dr. Barnes and Dr. Wu and relying on the opinion of Dr. Grange. Defendant contends that the ALJ's residual functional capacity finding is based upon substantial

evidence in the record as a whole.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ concluded that plaintiff has the residual functional capacity to perform medium work, with a moderate limitation in his ability to maintain attention and concentration, and a mild limitation in understanding, memory, maintaining pace, and following directions. (Tr. 21). Plaintiff contends that the ALJ erred in disregarding the opinions of Dr. Barnes and Dr. Wu and relying on the opinion of Dr. Grange in determining plaintiff's residual functional capacity.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be

contrasted with the axiom that "[t]he opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2)) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Plaintiff saw Dr. Barnes for a psychological consultation on March 4, 2003. (Tr. 240). Dr. Barnes noted that the PKU diet was very difficult to adhere to and that failure to follow the diet often results in increased attention deficit, impulsivity, irritability, and reduced learning ability. (Id.). After administering psychological tests, Dr. Barnes diagnosed plaintiff with ADHD, deficit in executive function, rule out learning disability, and a GAF of 55. (Tr. 241). Dr. Barnes recommended a medication adjustment to control ADHD symptoms and individual psychotherapy. (Id.). She noted that plaintiff's ADHD symptoms and related difficulties with executive function result in "significant disability with regard to employment," and recommended that plaintiff apply for social security benefits while pursuing psychotherapy and vocational

counseling. (Tr. 242). Dr. Barnes also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on June 24, 2003, in which she expressed the opinion that plaintiff's abilities were good to fair in all areas except that his ability to be attentive/concentrate, and follow complex job instructions were "poor or none." (Tr. 245).

Plaintiff saw Dr. Wu for a psychiatric evaluation on August 18, 2003. (Tr. 250-53). Dr. Wu found plaintiff to be "partially reliable, but a poor historian." (Tr. 250). Dr. Wu noted that plaintiff was not compliant with his PKU diet. (Id.). Dr. Wu diagnosed plaintiff with ADHD, probably secondary to PKU; history of Post Traumatic Stress Disorder; alcohol dependence; marijuana abuse; and a GAF of 50. (Tr. 252). Dr. Wu recommended that plaintiff try Strattera or Wellbutrin, and advised plaintiff to abstain from drug use and comply with his suggested diet. (Tr. 253). Dr. Wu also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on May 27, 2004, in which she expressed the opinion that plaintiff's ability to follow work rules, use judgment, be attentive/concentrate, follow complex job instructions, follow detailed but not complex instructions, and follow simple job instructions were "poor or none." (Tr. 248). Dr. Wu stated that as long as plaintiff is unable to control his PK levels, his attention and memory will be poor and he will have trouble holding full-time employment. (Tr. 249).

The ALJ discussed the assessments of Dr. Barnes and Dr. Wu in his opinion. He then indicated that he was giving greater weight to the findings of plaintiff's treating physician, Dr. Grange. (Tr. 19). The ALJ explained that he was according significant weight to Dr. Grange's opinion due to the length, nature, or extent of her relationship with plaintiff, supportability with medical signs and laboratory findings, consistency with the record, and area of specialization. (Tr.

20).

Plaintiff saw Dr. Grange on July 15, 2002, and January 2, 2003, for treatment of his PKU. (Tr. 156-57, 154-55). On July 15, 2002, Dr. Grange noted that although plaintiff's general health was good, he had not been drinking his formula for at least six months and had not been following his PKU diet. (Tr. 156). Dr. Grange advised plaintiff to drink his formula on a regular basis and limit his phenylalanine intake. (Id.). On January 2, 2003, plaintiff reported that he still was not following his PKU diet very well. (Tr. 154). Dr. Grange found that plaintiff's condition had been stable for the prior six months. (Id.). Dr. Grange completed a Physical Medical Source Statement on February 4, 2003, in which she indicated that plaintiff has no physical restrictions due to his PKU. (Tr. 108-09). Dr. Grange noted that plaintiff suffers attention deficits and a learning disability as a result of the PKU. (Tr. 110). Dr. Grange expressed the opinion that plaintiff was capable of sustaining a 40-hour workweek on a continual basis despite his impairments. (Id.).

The ALJ properly assigned controlling weight to the findings of Dr. Grange. Dr. Grange was plaintiff's treating physician and her opinion regarding plaintiff's restrictions is supported by her own treatment notes. Dr. Grange treated plaintiff's PKU and acknowledged that it caused plaintiff to suffer attention deficits and a learning disability, yet she found that plaintiff was able to work forty hours a week despite these impairments. Dr. Grange's findings are also supported by the record as a whole. The ALJ found that the more restrictive assessments of Drs. Barnes and Wu were inconsistent with other evidence in the record.

The ALJ evaluated plaintiff's credibility in accordance with Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Polaski requires the consideration of: (1) the claimant's daily

activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  739 F.2d at 1322.

The ALJ first noted that plaintiff did not comply with medical advice regarding his restrictive PKU diet.  (Tr. 19).  Noncompliance with medical treatment is a proper factor in considering a claimant's credibility.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  Plaintiff's noncompliance with his diet is well-documented in the medical record.  (Tr. 156-57, 154-55, 240, 251).  Dr. Barnes noted that failure to follow the PKU diet often results in increased attention deficit, impulsivity, irritability, and reduced learning ability.  (Tr. 240).  Even plaintiff acknowledged that he is more forgetful and has difficulty concentrating when his phenylalanine levels are high.  (Tr. 156).  Plaintiff's medical records also reveal that plaintiff did not take his Ritalin as prescribed.  (Tr. 156, 250).  Plaintiff indicated that he experienced more difficulty with concentration when he did not take the Ritalin.  (Tr. 250).  As such, the ALJ properly considered plaintiff's noncompliance with medical advice regarding dietary restrictions and medication in considering plaintiff's credibility.

The ALJ also considered plaintiff's own testimony.  Plaintiff testified that he did not work because he had no transportation and no references.  (Tr. 51).  This statement is inconsistent with plaintiff's allegation of disability due to his physical and mental impairments.

The ALJ next considered plaintiff's daily activities.  The ALJ noted that plaintiff told the consultative psychological examiner that he cooks, cleans, shops for groceries, does laundry, arranges transportation from other people, is capable of taking public transportation, talks with friends on the telephone, and goes out with friends approximately twice a week.  (Tr. 20, 218).

Significant daily activities may be inconsistent with claims of disabling impairments. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

Finally, the ALJ pointed out that plaintiff made inconsistent statements to consultative psychologist Dr. Johns regarding his use of substances. (Tr. 20, 214). Dr. Johns indicated that it was difficult to determine plaintiff's usage due to his inconsistent statements. (Tr. 215). Plaintiff's inconsistent statements to a medical provider detract from his credibility.

In sum, the ALJ's residual functional capacity determination is consistent with the record as a whole. The ALJ considered plaintiff's credibility and determined that plaintiff's noncompliance with medical advice, significant daily activities, and plaintiff's own statements detracted from his credibility. After reviewing the objective medical evidence of record, the ALJ properly accorded significant weight to plaintiff's treating physician, Dr. Grange. The ALJ found that plaintiff has a moderate limitation in his ability to maintain attention and concentration and a mild limitation in understanding, memory, maintaining pace, and following directions. (Tr. 21). As such, the ALJ did not ignore the findings of Drs. Barnes and Wu regarding plaintiff's mental impairments. Rather, the ALJ accorded greater weight to the opinion of Dr. Grange, who found that plaintiff was capable of working forty hours a week despite his mental impairments. Dr. Grange's opinion is consistent with the record as a whole.

## 2.    **Plaintiff's Ability to Perform His Past Relevant Work**

Plaintiff next argues that the ALJ erred in determining that plaintiff was able to perform his past work as a landscaper. Defendant contends that the ALJ properly compared plaintiff's

residual functional capacity with the demands of his past relevant work using vocational expert testimony.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." Id.

The ALJ asked the vocational expert to assume an individual of plaintiff's age and education, who is capable of performing medium work, with the following limitations: a mild limitation in understanding, memory, and the ability to follow directions; and a moderate limitation in attention, concentration, and pace. (Tr. 55). These limitations are consistent with the ALJ's residual functional capacity determination. The vocational expert testified that such an individual could perform plaintiff's past work as a landscape laborer. (Id.).

The undersigned has found that the residual functional capacity formulated by the ALJ is supported by substantial evidence. The hypothetical question posed to the vocational expert was based upon this residual functional capacity. The ALJ properly used vocational expert testimony to determine that plaintiff could perform his past relevant work as a landscape laborer.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

So Ordered this 6th day of September, 2007.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE